IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DNA GENOTEK INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-355-SLR |
| | ) | |
| ANCESTRY.COM DNA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF DNA GENOTEK INC.'S OPPOSITION TO
## ANCESTRY.COM DNA, LLC'S MOTION TO DISMISS

OF COUNSEL:
David C. Doyle
Brian M. Kramer
MORRISON FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, CA 92130
(858) 314-5415

Dated:  September 3, 2015

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
300 Delaware Avenue, Suite 1120
SHAW KELLER LLP
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................................................. 1

II.     NATURE AND STAGE OF THE PROCEEDINGS ...................................... 2

III.    SUMMARY OF THE ARGUMENT ............................................................. 4

IV.     COUNTERSTATEMENT OF FACTS .......................................................... 4

        A.    DNA Genotek Makes Patented Collection Devices, and Ancestry Uses
              Such Devices in its Genealogy Business ............................................... 4

        B.    DNA Genotek and Ancestry Negotiated a Supply Contract for DNA
              Genotek to Supply Ancestry With Patented Devices and For Ancestry to
              Disclose All Improvements to DNA Genotek ........................................ 6

        C.    Ancestry Secretly Designed an Improved Version of DNA Genotek's
              Product and Filed a Patent Application for Its Improved Product ......... 7

        D.    Ancestry Knew About DNA Genotek's Patent Portfolio, Including the
              '381 Patent-at-Issue in This Case ......................................................... 7

              1.    Ancestry's Mr. Chahine Approved a Change in Product Label That
                    Reflected the Issuance of the '381 Patent ................................... 8

              2.    Ancestry's Patent Application Was Rejected as Obvious in Light
                    of the '381 Patent's Application ............................................. 10

V.      ARGUMENT ............................................................................................... 11

        A.    DNA Genotek Set Forth Ample Evidence That Ancestry's Infringement
              Was Willful ........................................................................................ 11

        B.    DNA Genotek States Claims of Conversion and Trespass to Chattel ............... 13

              1.    The Breach of Contract Claim and Tort Claims Are Distinct ................. 13

              2.    The Economic Loss Doctrine Cannot Bar the Tort Claims Because
                    the Damage to Other Property Exception Applies ................................... 16

              3.    The Amended Complaint Sufficiently Alleges Damages Resulting
                    From the Alternative Cause of Action of Trespass to Chattel ................. 17

        C.    DNA Genotek States a Claim to Quiet Title ........................................ 17

              1.    The Law Recognizes a Quiet Title Claim Based on DNA
                    Genotek's Allegations ............................................................... 18

              2.    The Economic Loss Doctrine Does Not Apply to DNA Genotek's
                    Quiet Title Claim ..................................................................... 20

              3.    DNA Genotek Seeks a Remedy Protecting its Intellectual Property ....... 20

VI.     CONCLUSION ........................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*1st Nat'l Credit Corp. v. Von Hake*,
 511 F. Supp. 634 (D. Utah 1981)..........................................................................18

*Advanced Recovery Sys. LLC v. Am. Agencies LLC*,
 No. 2:13-CV-00283-DAK, 2013 WL 5969837 (D. Utah Nov. 7, 2013)................................14

*Bair v. Axiom Design, L.L.C.*,
 20 P.3d 388 (Utah 2001)....................................................................................14

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)........................................................................................11

*Bennett v. Huish*,
 155 P.3d 917 (Utah Ct. App. 2007) .......................................................................14

*Campbell v. Castle Stone Homes, Inc.*,
 No. 2:09-cv-250 TS, 2011 U.S. Dist. LEXIS 27266 (D. Utah Mar. 15, 2011) ......................18

*Edwards v. A.H. Cornell & Son, Inc.*,
 610 F.3d 217 (3d Cir. 2010)...............................................................................11

*Fowler v. UPMC Shadyside*,
 578 F.3d 203 (3d Cir. 2009)...............................................................................11

*Hermansen v. Tasulis*,
 48 P.3d 235 (Utah 2002)...................................................................................20

*Holladay Towne Ctr., L.L.C. v. Brown Family Holdings, L.L.C.*,
 248 P.3d 452 (Utah 2011)..................................................................................19

*Imonex Services, Inc. v. W.H. Munzprufer Dietmar Trenner GmbH*,
 408 F.3d 1374 (Fed. Cir. 2005)............................................................................13

*Kost v. Kozakiewicz*,
 1 F.3d 176 (3d Cir. 1993) .................................................................................11

*MONEC Holding AG v. Motorola Mobility, Inc.*,
 897 F. Supp. 2d 225 (D. Del. 2012)...................................................................11, 13

*Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*,
 793 F.3d 1177 (10th Cir. 2015) ...........................................................................15

*Quest Integrity USA, LLC v. Clean Harbors Indus. Servs., Inc.*,
  Nos. 14-1482-SLR, 14-1483-SLR, 2015 U.S. Dist. LEXIS 95148 (D. Del. July 22,
  2015) ............................................................................................................................11

*Reighard v. Yates*,
  285 P.3d 1168 (Utah 2012) ........................................................................................16

*Spherix Inc. v. Cisco Systems, Inc.*,
  No. 14-393-SLR, 2015 U.S. Dist. LEXIS 41069 (D. Del. Mar. 30, 2015)..............12

*Spherix Inc. v. Juniper Networks, Inc.*,
  No. 14-578-SLR, 2015 U.S. Dist. LEXIS 41057 (D. Del. Mar. 31, 2015).........11, 12

*Taylor v. Pathmark Stores, Inc.*,
  177 F.3d 180 (3d Cir. 1999).......................................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)....................................................................................................11

*Western States Contracting v. Spilsbury*,
  No. 2:10-cv-1141-TC, 2014 U.S. Dist. LEXIS 119731 (D. Utah Aug. 26, 2014) .................19

**STATUTES**

35 U.S.C. § 261 ...............................................................................................................18

Utah Code Annotated § 78B-6-1301 ..........................................................................18, 19

**OTHER AUTHORITIES**

4 Charles Alan Wright, et al., *Federal Practice & Procedure, Federal Rules of Civil
  Procedure*, § 1044 (3d ed. 2015) ...............................................................................18

5 Charles Alan Wright, et al., *Federal Practice & Procedure, Federal Rules of Civil
  Procedure*, § 1250 (3d ed. 2015) ...............................................................................18

Keith Jones *et al.*, *Problems with Royalty Rates, Royalty Stacking, and Royalty Packing
  issues*, in *Intellectual Property Management in Health and Agricultural Innovation: A
  Handbook of Best Practices* (Krattiger, Mahoney& Nelsen *et al.* eds. 2007)..................16

Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*, 85 Tex. L. Rev.
  1991, 1993 (2007).......................................................................................................16

Restatement (Second) of Torts § 217 (1965)...................................................................14

Restatement (Second) of Torts § 221 (1965)...................................................................14

## I.  INTRODUCTION

The First Amended Complaint ("FAC") describes the relationship between a supplier and its former customer.  The supplier sold a product to its customer.  The customer developed an improved version of the product and began secretly making the improved version itself.  Normally, a customer can do that.  But in this case, it could not because: (1) the supplier-customer contract required that any of the customer's improvements must be disclosed to the supplier and that such improvements would be owned solely by the supplier; and (2) the improved product infringed at least one of the supplier's patents.

DNA Genotek Inc. ("DNA Genotek") is the supplier.  Ancestry.com DNA LLC ("Ancestry") is the former customer.  The product is one of DNA Genotek's patented DNA collection devices, over 300,000 of which were sold to Ancestry over two years.  Ken Chahine, the founder of Ancestry's DNA division and a patent attorney on the side, secretly designed with three others an improved version of DNA Genotek's product ("the Ancestry Product").  That was a breach of the parties' contract.  Beyond breaching the contract, Ancestry filed a patent application for the Ancestry Product, creating a new property right and claiming ownership for itself.  That was an act of conversion.

Ancestry knew that DNA Genotek's products were patented.  Mr. Chahine personally approved Ancestry's product label for the DNA Genotek-made Ancestry product, which included an internet link showing that DNA Genotek's product, which was customized for Ancestry, was protected by two DNA Genotek utility patents, including U.S. Patent No. 8,221,381 ("the '381 patent") at issue here.  Mr. Chahine's secret patent application discussed only five prior art references, all of which were owned by DNA Genotek, a company with only seven U.S. utility patents in total.  While Ancestry omitted the '381 patent from its specification, the patent office processing Ancestry's PCT application immediately caught it.  Six months

before DNA Genotek filed suit, Ancestry's patent application for the Ancestry Product was rejected as being obvious in light of the '381 patent's published application. The '381 patent was listed as a family member. Thus, Ancestry knew about the '381 patent by at least that date, and likely earlier. It forged ahead with its infringing product anyway.

Notably, Ancestry does not claim in its motion that it did not actually consider or otherwise know about the '381 patent before DNA Genotek filed suit or before Ancestry embarked upon its secret activities behind the back of its contract partner. Regarding Ancestry's other grounds for dismissal, Ancestry focuses almost entirely on the original complaint, ignoring that the FAC clarifies which facts support the breach of contract claims and the separate, additional facts that support the conversion and other claims. Considering the FAC, not the original complaint, Ancestry's "economic loss doctrine" and other arguments lack merit. Ancestry's motion should be denied.

## II.   NATURE AND STAGE OF THE PROCEEDINGS

DNA Genotek filed its complaint against Ancestry on May 4, 2015. (D.I. 1.) On July 24, 2015, before Ancestry filed a response, DNA Genotek amended its complaint to supplement the factual allegations with the results of its continued investigation into Ancestry's willful infringement. (D.I. 7.) It also clarified the factual distinction between its breach of contract and conversion claims (*compare* D.I. 7 ¶¶ 9-34 to ¶¶ 35-38), and it further clarified that its trespass to chattel claim is stated in the alternative to its conversion claim. (*Id.* ¶ 75.) Ancestry filed the present motion to dismiss some, but not all, of the counts in the complaint. (D.I. 10, 11.)

The FAC includes five counts: (1) patent infringement; (2) breach of contract; (3) conversion; (4) trespass to chattel; and (5) an action to quiet title. The facts supporting the patent infringement claim are straightforward. The FAC identifies the accused product and alleges it infringes the '381 patent. (D.I. 7 ¶¶ 22-34, 39-57.) It separately asserts that the infringement

was willful.  (*Id.* ¶¶ 43-47.)  The FAC attaches direct evidence documenting that Ancestry knew

about the '381 patent by at least November 2014 (D.I. 7-2, Ex. B, D.I. pp. 23-24; *see also*

Declaration of Brian M. Kramer ("Kramer Decl."), Ex. 1 at 19-20)[1], and describes the additional,

circumstantial evidence that Ancestry knew about the patent much earlier than that.  For

example, DNA Genotek notes that Mr. Chahine, the head of Ancestry's DNA unit, and a patent

attorney, approved the product label for the DNA Genotek-made Ancestry product with a link

showing that the product he sold was protected by the '381 patent.  (D.I. 7 ¶¶ 43-47.)  Exhibit B

to the FAC shows that Ancestry's patent application covering the Ancestry Product was rejected

as obvious over two references, one of which was the '381 patent's application.  (D.I. 7-2, Ex. B,

D.I. pp. 23-24; *see also* Kramer Decl., Ex. 1 at 19-20.)  Ancestry continued to make and sell its

product.  (D.I. 7 ¶ 43.)

The FAC describes the contract between DNA Genotek and Ancestry.  (D.I. 7 ¶¶ 9-21.)

It notes that Ancestry was required to disclose any improvements it made to DNA Genotek's

product.  (*Id.* ¶ 20.)  Ancestry did not disclose its improvements to DNA Genotek.  (*Id.* ¶¶ 29,

34.)  That was a breach of the contract.  (*Id.* ¶ 62.)

The FAC continues its recitation of facts with the additional facts supporting the

conversion claim.  (*Id.* ¶¶ 35-38.)  After Ancestry concealed its improvements and breached the

contract, it filed a patent application, creating a new property right.  (*Id.* ¶ 36.)  That was an act

of conversion, or, alternatively, a trespass to chattel.  (*Id.* ¶¶ 67-81.)

Finally, the FAC sets forth its action to quiet title.  (*Id.* ¶¶ 82-85.)  It explains that DNA

Genotek is the rightful owner of the inventions claimed in Ancestry's patent applications, and

seeks relief protecting DNA Genotek's ownership rights.  (*Id.*)

---

[1] Exhibit 1 to the Kramer Declaration is the same document as D.I. 7-2.  Highlighting and page numbers are added to this version for ease of reference.

### III.    SUMMARY OF THE ARGUMENT

1.    DNA Genotek has pleaded facts giving rise to at least an objective showing of recklessness of the infringement risk, and has therefore stated a claim for willfulness.  Contrary to Ancestry's argument, the pleadings establish that (1) Ancestry was directly involved in marking the DNA Genotek-made Ancestry product with a link to a patent notice that listed the '381 patent and just a handful of other patents, and that an Ancestry executive (himself a patent attorney and patent law professor) was personally involved in this marking decision, and (2) Ancestry's own patent application, of which the Ancestry Product is an embodiment, was rejected as obvious over the application for the '381 patent.

2.    Ancestry's economic loss doctrine argument fails, because Ancestry relies on DNA Genotek's original complaint, not the FAC, and because DNA Genotek's conversion and trespass to chattel claims are based on Ancestry's wrongful filing of patent applications, *not* its breach of contract for failure to disclose its inventions or DNA Genotek's contractual ownership of those inventions.  Ancestry's economic loss doctrine argument further fails because Ancestry's tortious conduct resulted in damage to other property compared to the contract claim.

3.    DNA Genotek has stated a claim to quiet title under either this Court's inherent equitable powers, which Ancestry's motion fails to acknowledge, or applicable state quiet title law.  Ancestry's arguments further fail because Ancestry does not correctly describe the scope of Utah's quiet title act, and presents no authority in support of its contention that a non-tort quiet title claim could be subject to the economic loss doctrine.

### IV.    COUNTERSTATEMENT OF FACTS

####     A.    DNA Genotek Makes Patented Collection Devices, and Ancestry Uses Such Devices in its Genealogy Business.

DNA Genotek is a leading provider of products for biological sample collection, including oral fluid sample collection and stabilization solutions for molecular testing

applications.  (D.I. 7 ¶ 7.)  DNA Genotek's products incorporate proprietary technology that is protected by a patent portfolio.  (*Id.*)  A search of the U.S. Patent and Trademark Office's ("PTO") patent assignment database reveals that DNA Genotek is the owner of seven issued U.S. utility patents and seven issued U.S. design patents.  (*See* Kramer Decl. ¶ 3.)  The '381 patent is one of DNA Genotek's utility patents.

Representative examples of a DNA Genotek product are depicted below.



The left picture is DNA Genotek's OraGene●DNA® Collection Kit Model OG-510.[2]  The right picture is a customized version of the OG-510 device that DNA Genotek made for Ancestry in 2012 and 2013.  (D.I. 7 ¶¶ 15, 47; D.I. 11 at 3-4.)  The product is used, for example, to collect and preserve a person's DNA for later testing by a lab.  The user supplies a saliva sample by spitting into the open end of the tube.  (D.I. 11 at 3.)  The cap is filled with a DNA preservative. When closed on top of the open tube, a "piercing member" punctures the preservative's storage membrane, causing the preservative to mix with the saliva sample.  The preserved DNA is shipped to a lab for testing.  (*See generally*, D.I. 7-1, Ex. A.)  DNA Genotek has developed and patented several variations of proprietary saliva DNA collection kits ("DNA Genotek Saliva

---

[2] *See* http://www.DNA Genotekenotek.com/ROW/products/OG510.html.

Collection Product") like the ones above.  (D.I. 7 ¶ 8.)[3]

Ancestry offers a DNA testing service to customers researching their ethnic and family histories, through which Ancestry provides its customers with a DNA saliva collection kit. Ancestry uses the returned kits to provide its customers with information about their ethnicity and relatives.  Ancestry used to provide its customers with a customized DNA Genotek Saliva Collection Product, as depicted above.  (D.I. 7 ¶ 15; D.I. 11 at 3-4.)  It now provides its customers its own saliva collection kit ("the Ancestry Product").  (D.I. 7 ¶ 34.)  According to assignment records at the PTO, Ancestry.com DNA LLC has a total of two U.S. patents and five published patent applications.  (Kramer Decl. ¶ 5, Ex. 2.)

> **B.**      **DNA Genotek and Ancestry Negotiated a Supply Contract for DNA Genotek to Supply Ancestry With Patented Devices and For Ancestry to Disclose All Improvements to DNA Genotek.**

The relationship between the parties began around January 2012.  (D.I. 7 ¶ 9.)  Ancestry and DNA Genotek negotiated a contract whereby it would provide DNA Genotek Saliva Collection Products to Ancestry.  (*Id.*)  Ancestry ordered 350,000 DNA Genotek Saliva Collection Products over two years.  (*Id.* ¶¶ 13, 15.)

Ancestry's purchases of the DNA Genotek Saliva Collection Products were governed by a set of "Terms and Conditions."  (*Id.* ¶ 18.)  Mr. Chahine, an authorized executive of Ancestry, signed the Terms and Conditions.  (*Id.* ¶¶ 14, 45.)  Under Section 10, DNA Genotek is the rightful owner of any new use, enhancement, or improvement of its products by Ancestry.  (*Id.* ¶ 20.)  To the extent that Ancestry developed a new use, improvement, or enhancement of the DNA Genotek Saliva Collection Product, whether it was patentable or not, Ancestry was

---

[3] DNA Genotek includes the pictures in this brief to help the Court better appreciate the background of this case.  The Court need not rely upon the pictures to conclude that DNA Genotek satisfied its pleading burden.

required to disclose it immediately to DNA Genotek.  (*Id.*)  Under Section 7 of the Terms and

Conditions, Ancestry is also prohibited from reverse engineering the chemical solution contained

in the DNA Genotek Saliva Collection Products.  (*Id.* ¶ 19.)

### C.   Ancestry Secretly Designed an Improved Version of DNA Genotek's Product and Filed a Patent Application for Its Improved Product.

During the two-year period when Ancestry bought its saliva collection device from DNA

Genotek, Ancestry was secretly designing an improved version of the collection device (the

Ancestry Product) that ultimately would replace the DNA Genotek Saliva Collection Product.

(D.I. 7 ¶¶ 25, 30.)  Ancestry failed to immediately disclose its improved collection device to

DNA Genotek.  (*Id.* ¶ 29.)

While hiding its improvements from DNA Genotek, Ancestry sought patent protection

for its device.  (D.I. 7-2, Ex. B.)  The contract between DNA Genotek and Ancestry did not bar

Ancestry from filing patent applications for any inventions it made.  Rather, it required Ancestry

to disclose its improvement to DNA Genotek and further provided that any improvements would

be owned by DNA Genotek.  (D.I. 7 ¶ 20.)  Ancestry's then-secret patent applications, PCT

Application No. WO 2015/017701 A1 ("the '701 Application"), claims priority to U.S.

Provisional Patent Application No. 61/861,329 ("the '329 Application"), which was filed on

August 1, 2013.  (DI. 7 ¶ 24; Kramer Decl. Ex. 1 at 1.)  At that time, the contract requiring

Ancestry to disclose improvements to DNA Genotek was in effect, yet Ancestry purposely

breached the agreement and kept its improvements to itself.  (D.I. 7 ¶ 29.)

### D.   Ancestry Knew About DNA Genotek's Patent Portfolio, Including the '381 Patent-at-Issue in This Case.

The FAC sets forth both circumstantial and direct evidence establishing Ancestry's

knowledge of the '381 patent.  The FAC sets forth circumstantial evidence that Mr. Chahine

knew about the '381 patent through his work approving the product label for Ancestry's DNA

7

Genotek-made product in 2012 and 2013.  (D.I. 7 ¶¶ 46-47.)  It also sets forth Ancestry's knowledge of a significant portion of the DNA Genotek patent portfolio based on its citation of five DNA Genotek references in Ancestry's patent applications, for which Mr. Chahine is the first named inventor.  (*Id.* ¶¶ 22-23.)  Perhaps most importantly, the FAC includes direct evidence showing the Ancestry patent application was rejected as obvious in light of the '381 patent's published patent application.  (D.I. 7-2, D.I. pp. 23-24; *see also* Kramer Decl. Ex. 1 at 19-20.)  At the very least, by the time Ancestry's patent application was declared obvious in light of the application for the '381 patent and other references, Ancestry was on notice that its product, which is depicted in the Ancestry patent applications, might infringe the '381 patent.

### 1.    Ancestry's Mr. Chanine Approved a Change in Product Label That Reflected the Issuance of the '381 Patent.

When the contractual relationship between Ancestry and DNA Genotek began, Mr. Chahine, described by Ancestry in its motion as merely an "employee," actually wore three hats. He was the head or "General Manager" for Ancestry's DNA business unit.  (D.I. ¶ 45.)  He was a registered patent attorney.  (*Id.*)  And he was a patent law professor.  (*Id.*)  On February 13, 2012, he signed a customer approval form indicating his receipt, approval, and acknowledgment of the custom packaging for the DNA Genotek-made Ancestry product.  (*Id.* ¶ 46.)  The signed form includes an image of the label that appeared on collection kits sold to Ancestry by DNA Genotek.  (*Id.*)  The label indicated that the product provided to Ancestry by DNA Genotek was covered by DNA Genotek's U.S. Patent No. 7,482,116 and other pending patents.  (*Id.*)



(Kramer Decl., Ex. 3 at 6.)

When Mr. Chahine first approved the above label, the application leading to the '381 patent was pending and publicly available, but the '381 patent had not yet issued. (*Id.*, Ex. 4.) The '381 patent issued on July 17, 2012. (D.I. 7-1, Ex. A.) Thereafter, DNA Genotek and Ancestry agreed to change the product label on the Ancestry Product so that the Ancestry Product label pointed users to a link on DNA Genotek's website, showing which of DNA Genotek's products correspond to DNA Genotek's patent portfolio. (D.I. 7 ¶ 47.) Specifically, on September 20, 2012, Ancestry and DNA Genotek agreed to amend the label and change the patent marking to include the words, "Patent (www.DNAGenotek.com /legalnotices)." (*Id.*; Kramer Decl. ¶ 8, Ex. 5 at 7.) Again, Mr. Chahine personally approved the amended label. (D.I. 7 ¶ 47.) Other than the patent information and the label's version number, all other aspects of the product label were unchanged.



(Kramer Decl., Ex. 5 at 7.)

No later than October 30, 2012, DNA Genotek's legal notices web page indicated that at least DNA Genotek Saliva Collection Product Model No. OG-510 was protected by the '381 patent and one other utility patent. (D.I. 7 ¶ 47.) The product DNA Genotek provided to Ancestry was a customized version of DNA Genotek's Model No. OG-510. (D.I. 7 ¶ 47.) The customized features of the product provided by DNA Genotek to Ancestry, *e.g.*, the color of the

cap (which was customized to match Ancestry's branding), were not patentably distinct features compared to Model No. OG-510.  (*Id.*)  Finding the '381 patent on DNA Genotek's legal notices website is not like finding a needle in a haystack.  The current version of DNA Genotek's legal notice lists only three utility patents and five design patents for all of DNA Genotek's products.[4] For the OG-510 specifically, DNA Genotek lists three utility patents and two design patents. (Kramer Decl. ¶ 9, Ex. 6.)

### 2.    Ancestry's Patent Application Was Rejected as Obvious in Light of the '381 Patent's Application.

On August 1, 2013, Ancestry filed the '329 Application and referenced DNA Genotek's patents and patent applications as prior art.  (D.I. 7 ¶¶ 23-24.)  Ancestry's '701 Application claimed priority to the '329 Application.  (*Id.* ¶ 24.)  Ancestry's patent applications remained secret until they first published on February 5, 2015.  (Kramer Decl., Ex. 1 at 1.)  But before publication of the Ancestry patent application, prosecution was ongoing at the international stage.  In a first office action, the International Bureau of the World Intellectual Property Organization determined that Ancestry's claims would have been obvious in light of two published patent applications, one of which was U.S. Published Patent Application No. 2009-0216213 A1.  (Kramer Decl. Ex. 7 at 4, 7.)  As the patent office pointed out, and as DNA Genotek attached to the FAC, the '381 patent-in-suit in this case is the U.S. Patent that issued from that application.  (D.I. 7-2, D.I. pp. 23-24; *see also* Kramer Decl., Ex. 1 at 19-20.)  This publicly-available record documents Ancestry's knowledge of the '381 patent as of at least November 14, 2014, if not much earlier.

---

[4] In October 2012, the DNA Genotek's legal notices web page would have only listed two utility and five design patents, as U.S. Patent No. 8,728,414 did not issue until May 20, 2014.  (Kramer Decl. ¶ 9, Ex. 6.)

## V.     ARGUMENT

Ancestry's Rule 12(b)(6) motion tests the sufficiency of the facts alleged by DNA Genotek in the FAC.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  The Third Circuit requires a two-part analysis when reviewing a Rule 12(b)(6) motion.  *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010).  First, this Court must accept DNA Genotek's asserted facts as true.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  The asserted facts may include the public record, DNA Genotek's FAC, exhibits attached to the FAC, and documents incorporated into the FAC by reference.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Quest Integrity USA, LLC v. Clean Harbors Indus. Servs., Inc.*, Nos. 14-1482-SLR, 14-1483-SLR, 2015 U.S. Dist. LEXIS 95148, at *4-*5 & n.4 (D. Del. July 22, 2015) (noting that information obtained from the PTO website may be considered on a motion to dismiss).  Second, this Court must determine whether those facts sufficiently show that DNA Genotek has a "plausible claim for relief."  *Id.* at *5 (quoting *Fowler*, 578 F.3d at 211).

### A.     DNA Genotek Set Forth Ample Evidence That Ancestry's Infringement Was Willful.

To survive a motion to dismiss at the pleadings stage, DNA Genotek need only "plead facts giving rise to at least a showing of objective recklessness of the infringement risk."  *Spherix Inc. v. Juniper Networks, Inc.*, No. 14-578-SLR, 2015 U.S. Dist. LEXIS 41057, at *4 (D. Del. Mar. 31, 2015) (citation omitted).  DNA Genotek need not plead "[a]ctual knowledge of infringement or the infringement risk," but only "factual circumstances in which the patents-in-suit [are] called to the attention [of Ancestry]."  *MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 236 (D. Del. 2012) (internal quotations omitted).

There is ample evidence that the '381 patent was called to Ancestry's attention before DNA Genotek filed this lawsuit.  The FAC explains how Ancestry breached its contract with

DNA Genotek by designing an improved product behind DNA Genotek's back.  When Ancestry

then tried to patent its secret invention (an act of conversion), Ancestry's patent application was

rejected over the application for the '381 patent.  (D.I. 7-2, D.I. pp. 5, 23-24; *see also* Kramer

Decl., Ex. 1 at 1, 19-20.)  The patent office specifically noted that the '381 patent itself was part

of that family.  (*Id.*)  That put Ancestry on notice of the '381 patent.  Because the Ancestry

patent application is an embodiment of the Ancestry Product, and because the patent office said

that the Ancestry patent application was obvious in light of the '381 patent, it follows that the

Ancestry Product might infringe the '381 patent.  To the extent that Ancestry ignored the

implications of infringement when its patent was rejected over the DNA Genotek '381 patent,

that amounted to the required objective recklessness at the pleadings stage.

The cases cited by Ancestry are factually inapposite.  In *Spherix Inc. v. Cisco Systems,*

*Inc.*, No. 14-393-SLR, 2015 U.S. Dist. LEXIS 41069 (D. Del. Mar. 30, 2015), this Court held

that the accused infringer's alleged knowledge of some patents in a 6,000 patent auction

catalogue was not sufficient to show knowledge of other patents in the catalogue.  *Id.* at *5.

Here, DNA Genotek has a portfolio of *seven* patents, not 6,000.  (Kramer Decl. ¶ 3.)  Similarly,

in *Spherix Inc. v. Juniper Networks, Inc.*, this Court held that knowledge of a patent could not be

inferred when the patent-at-issue has been listed as one of 31 references cited during the

prosecution of two of the accused infringer's 1,700 patents.  No. 14-578-SLR, 2015 U.S. Dist.

LEXIS 41057, at *5-6 (D. Del. Mar. 31, 2015).  Here, Ancestry is a company with only two

issued patents and five published patent applications.  (Kramer Decl. ¶ 5, Ex. 2.)  And the

application for the '381 patent was one of just two references forming the basis of Ancestry's

obviousness rejection.  This was a red flag, not a needle in a haystack.[5]

DNA Genotek does not simply rely on the allegation that its products were marked with a patent number. (*Compare* D.I. 11 at 2.)  DNA Genotek alleges that Ancestry had a role in marking its own DNA Genotek-made product with a link to the '381 patent.  (D.I. 7 ¶¶ 45-47.)  That distinguishes this situation from cases such as *Imonex Services, Inc. v. W.H. Munzprufer Dietmar Trenner GmbH*, 408 F.3d 1374 (Fed. Cir. 2005), which recites the general proposition that the duty of care not to infringe others' patent rights is not triggered merely because a patent owner marks its products.  *Id.* at 1377-78.  The FAC also alleges that Mr. Chahine, a registered patent attorney and the first named inventor of the Ancestry '701 Application, helped DNA Genotek approve a product label for Ancestry's own product.  (D.I. 7 ¶¶ 45-47.)  It is more than plausible that Mr. Chahine or someone else at Ancestry viewed the contents of the link placed on Ancestry's own former product, and saw the '381 patent as one of two utility patents covering the product.  At the least, this connection between the '381 patent and Ancestry's products was "so obvious that it should have been known."  *MONEC Holding*, 897 F. Supp. 2d at 235.

### B.   DNA Genotek States Claims of Conversion and Trespass to Chattel.

The economic loss doctrine does not apply to DNA Genotek's conversion and trespass to chattel claims because DNA Genotek's contract claim is based on separate conduct.  Moreover, even if the economic loss doctrine were relevant, a key exception applies because DNA Genotek alleges a separate "damage to other property" based on Ancestry's acts of conversion.

### 1.   The Breach of Contract Claim and Tort Claims Are Distinct.

The economic loss doctrine cannot bar DNA Genotek's tort claims unless they rely on the

---

[5] Why Ancestry, a company led by a patent attorney, disclosed five DNA Genotek references to the patent office, but did not disclose the DNA Genotek patent application that rendered Ancestry's claims obvious, is something that DNA Genotek will explore in discovery.

"exact same conduct" that gives rise to the contract claim.  *See Advanced Recovery Sys. LLC v. Am. Agencies LLC*, No. 2:13-CV-00283-DAK, 2013 WL 5969837, at *5 (D. Utah Nov. 7, 2013).

The elements of breach of contract are:  "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."  *See Bair v. Axiom Design*, *L.L.C.*, 20 P.3d 388, 392 (Utah 2001).[6]  Here, the Terms and Conditions are the contract.  DNA Genotek fulfilled its obligations by supplying DNA Genotek Saliva Collection Products to Ancestry.  Ancestry failed to perform two key obligations: (1) Ancestry was required to disclose the existence of any new use, enhancement, or improvement Ancestry made to DNA Genotek's products; and (2) Ancestry was precluded from reverse engineering the chemical solution in the DNA Genotek Saliva Collection Products.  (D.I. 7 ¶¶ 19-20, 32-33.)

The elements of conversion differ from the elements of a breach of contract.  Conversion is (1) an act of willful interference with property, (2) done without lawful justification, and (3) by which the person entitled to property is deprived of its use and possession.  *Bennett v. Huish*, 155 P.3d 917, 928 (Utah Ct. App. 2007).  Trespass to chattel occurs when one (1) intentionally dispossesses another of a chattel, or (2) uses or intermeddles with the chattel in the possession of another."  Restatement (Second) of Torts § 217 (1965); *see also id.* § 221 ("[D]ispossession may be committed by intentionally . . . taking the chattel from the possession of another without the other's consent, or . . . barring the possessor's access to the chattel . . . .").

Ancestry states that "the conduct that Genotek alleged for its breach of contract claim is *identical* to the conduct that Genotek identified for its conversion and trespass to chattel claims."

---

[6] Ancestry argues that DNA Genotek's tort claims are governed by Utah law.  DNA Genotek does not concede that Utah law applies to its tort claims, as discovery may help determine the proper choice of law, since many of the key acts may have taken place in California or elsewhere. Solely for purposes of this opposition, DNA Genotek applies Utah law to demonstrate why Ancestry's motion fails.

(D.I. 11 at 11.)  But Ancestry cites to the original complaint before it was amended to clarify the distinction between the breach of contract and conversion claims.  It is axiomatic that "an amended complaint super[s]edes an original complaint and renders the original complaint without legal effect."  *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 793 F.3d 1177, 1181 (10th Cir. 2015) (quoting *Mink v. Suthers*, 482 F.3d 1244, 1254 (10th Cir. 2007)).

Considering the FAC, different facts give rise to the breach of contract and conversion claims.  (D.I. 7 ¶ 35.)  Specifically, by filing the '329 Application and the '701 Application with the intent to assign them to itself, Ancestry committed an act of conversion.  While the Terms and Conditions create the legal right by which DNA Genotek owns any improvements made by Ancestry, Ancestry's filing and assignment of the Applications was not itself a breach of the contract.  Had Ancestry made an improvement to DNA Genotek's product, immediately disclosed it to DNA Genotek, and openly filed a patent application, there would be no breach of the Terms and Conditions.  But once Ancestry took steps to assign the patent to itself with the intention of depriving DNA Genotek of ownership, it committed an act of conversion.

The FAC draws a line between the conduct giving rise to breach of contract and the conduct giving rise to the conversion claim.

| Conduct Constituting Breach | Conduct Constituting Trespass to Chattel and Conversion |
| --- | --- |
| The contract between the parties "prohibits Ancestry from reverse engineering the chemical solution contained in the DNA Genotek Saliva Collection Products," and the contract also requires that "[t]o the extent that Ancestry developed a new use, improvement, or enhancement of the DNA Genotek Saliva Collection Products, whether separately patentable or not, Ancestry was required to disclose it immediately to DNA Genotek." (D.I. 7 ¶¶ 19-20.) | "By filing the '329 Application and the '701 Application and submitting an assignment to Ancestry, as opposed to an assignment to DNA Genotek, Ancestry converted a property right that otherwise should belong to DNA Genotek." (D.I. 7 ¶ 36.) |

| | |
|---|---|
| Ancestry breached the contract "at least by failing to disclose timely the Ancestry Product to DNA Genotek" and by "reverse engineering the chemical solution contained in the DNA Genotek Saliva Collection Products to develop the Ancestry Product."  (D.I. 7 ¶¶ 62-63.) | "By filing the '329 Application and the '701 Application with the intent to assign ownership to Ancestry, Ancestry has willfully and substantially interfered with intellectual property rights belonging to DNA Genotek." (D.I. 7 ¶¶ 69, 77.) |

Ancestry is wrong that the exact same conduct gives rise to both claims.  Accordingly, its motion should be denied.

### 2.    The Economic Loss Doctrine Cannot Bar the Tort Claims Because the Damage to Other Property Exception Applies.

Even if the facts establishing breach of contract and conversion were the same, the economic loss doctrine does not apply because DNA Genotek alleges that Ancestry's conversion results in "damage to other property" compared to the breach of contract claims.  *See Reighard v. Yates*, 285 P.3d 1168, 1177 (Utah 2012).  "'Other property' is property that is outside the scope of a contract and unaffected by the contract bargain."  *Id.*  "[W]hen property falls outside the scope of a contract, the economic loss rule will not apply and relief may be available in tort."  *Id.*

Ancestry's tortious acts caused damage to DNA Genotek's property that is outside the scope of the contract.  For example, Ancestry's conversion and trespass to chattel damaged DNA Genotek's patent portfolio because the filing of the applications dilutes the royalties that DNA Genotek can collect and diminishes the value of DNA Genotek's portfolio.  (D.I. 7 ¶¶ 35-38); *see also* Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*, 85 Tex. L. Rev. 1991, 1993 (2007) (discussing implications of royalty stacking when a product is subject to multiple patents).  If a customer wishes to practice the embodiment of DNA Genotek's '381 patent that is also reflected in Ancestry's Applications, it would have to pay a royalty to both DNA Genotek and to Ancestry.  A customer will pay less in royalties to each of multiple entities than it would pay to a single entity.  *See* Keith Jones *et al.*, *Problems with Royalty Rates, Royalty Stacking, and Royalty Packing Issues*, in *Intellectual Property Management in Health and*

16

*Agricultural Innovation: A Handbook of Best Practices* (Krattiger, Mahoney& Nelsen *et al.* eds.

2007), http://www.iphandbook.org/handbook/ch11/p09/ (if royalty percentage is exceeded due to

royalty stacking, each licensor often accepts a pro rata reduction of royalties.)  Thus, the value

that DNA Genotek can recoup in royalties from its patent portfolio is diminished by Ancestry's

wrongful filing of the '329 and '701 Applications.

> **3.     The Amended Complaint Sufficiently Alleges Damages
> Resulting From the Alternative Cause of Action of Trespass to
> Chattel.**

Ancestry also argues that DNA Genotek's trespass to chattel claim "fails because

Genotek fails to plead any harm to the chattel in question—AncestryDNA's patent applications."

(D.I. 11 at 12).[7]  But the FAC expressly cites the damage to the patent applications in the

trespass to chattel section.  (D.I. 7 ¶¶ 77, 80-81.)

The intellectual property claimed by the '329 and '701 Applications belongs to DNA

Genotek.  Ancestry should have assigned the applications—the chattel in question—to DNA

Genotek.  By failing to do so, Ancestry deprived DNA Genotek of the right to make critical

decisions in prosecuting the applications, such as whether to file and what claims to seek.

> **C.     DNA Genotek States a Claim to Quiet Title.**

Ancestry's motion to dismiss DNA Genotek's quiet title claim must fail because

Ancestry ignores the Court's inherent equitable power to quiet title to property, and because

Ancestry misunderstands the scope of Utah's quiet title statute.  Moreover, Ancestry presents no

authority to support its argument that a quiet title claim is barred by the economic loss doctrine,

which is defeated by Ancestry's concession that the economic loss doctrine concerns tort claims.

---

[7] As noted in the FAC, DNA Genotek's trespass to chattel claim is an alternative to the
conversion claim. *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 189 (3d Cir. 1999) (a plaintiff
may plead in the alterative even if the theories are alleged to be inconsistent).

1.      **The Law Recognizes a Quiet Title Claim Based on DNA
Genotek's Allegations.**

DNA Genotek has stated a claim under either this Court's inherent equitable powers or applicable state quiet title law.  First, it is well-accepted that federal courts have inherent equitable power to quiet title to property.  4 Charles Alan Wright, *et al., Federal Practice & Procedure, Federal Rules of Civil Procedure*, § 1044 (3d ed. 2015) ("Wright & Miller"); *1st Nat'l Credit Corp. v. Von Hake*, 511 F. Supp. 634, 637 (D. Utah 1981) (recognizing Utah's statutory quiet title scheme and that "[f]ederal courts may *also* hear and determine actions to quiet title within their equitable jurisdiction") (emphasis added).  This inherent equitable power "is not ousted by state legislation providing a remedy by an action at law."  Wright & Miller § 1044.  Ancestry is therefore mistaken that DNA Genotek's "quiet title claim is governed by either Utah or Ontario law."  (D.I. 11 at 12.)

All that a plaintiff must do to avail itself of a federal court's inherent power to quiet title is "allege and ultimately prove [its] ownership" of the property.  5 Wright & Miller § 1250. DNA Genotek easily meets this pleading burden by alleging that it is the rightful owner of the property rights claimed in the '329 Application and the '701 Application.  (D.I. 7 ¶¶ 28, 83.)

Second, Ancestry does not accurately describe Utah's quiet title statute.  Under Utah Code Annotated § 78B-6-1301, "[a] person may bring an action against another person to determine rights, interests, or claims to or in personal[8] or real property."  "This language is broad, including not just claims to title, but any right or interest an adverse party may assert in personal or real property."  *Campbell v. Castle Stone Homes, Inc.*, No. 2:09-cv-250 TS, 2011 U.S. Dist. LEXIS 27266, at *24 (D. Utah Mar. 15, 2011).  Indeed, the Utah Supreme Court has recognized that parties "who could acquire an interest in the property created by the court's

_____

[8] United States patents are treated as personal property.  35 U.S.C. § 261.

judgment or decree" have standing under the statute.  *Holladay Towne Ctr., L.L.C. v. Brown Family Holdings, L.L.C.*, 248 P.3d 452, 464 (Utah 2011) (lessee, who did not possess title, had standing to bring quiet title action) (citing *Elder v. Nephi City*, 164 P.3d 1238 (Utah 2007)).

Ancestry cites only *Western States Contracting v. Spilsbury*, No. 2:10-cv-1141-TC, 2014 U.S. Dist. LEXIS 119731, at *37 (D. Utah Aug. 26, 2014), for the proposition that DNA Genotek has not stated a quiet title claim under Utah law.  (D.I. 11 at 12.)  But *Spilsbury* concerned an attempt by two contractors to assert quiet title based on their mechanics' liens.  The court explained that mechanics' liens can never be the basis of an action to quiet title because "a lien does not confer title."  2014 U.S. Dist. LEXIS 119731, at *36.  There is no indication that the contractors had an ownership interest in the property apart from their mechanics' liens.[9]

The situation here is different.  As set forth in the FAC, "[t]o the extent that Ancestry developed an enhanced or improved version of any DNA Genotek Saliva Collection Product, DNA Genotek is the rightful owner of that invention or product pursuant to Section 10 of the Terms and Conditions."  (D.I. 7 ¶ 28.)  Thus, DNA Genotek is already the owner of the inventions claimed in the '329 Application and '701 Application.  (*Id.* ¶¶ 83-85.)  By filing these applications, Ancestry made an adverse claim to DNA Genotek's rights, which DNA Genotek now seeks to redress through its quiet title claim.  (*Id.* ¶¶ 84-85.)  DNA Genotek has sufficiently stated "an action against another person to determine rights, interests, or claims to or in personal . . . property."  Utah Code Ann. § 78B-6-1301.

---

[9] Moreover, to the extent *Spilsbury* held that Utah's quiet title standing is limited to those who could acquire *title* to the property, as opposed to those who could acquire *an interest* in the property, it is plainly inconsistent with Utah law.  *See Holladay Towne Ctr.*, 248 P.3d at 464 ("HTC's characterization of the *Elder* rule as designed 'to ensure that any court order in a quiet title action actually awards title to one of the parties,' overstates this Court's holding, which limits standing to 'those who could acquire *an interest*,' not those who could acquire title.").

**2.      The Economic Loss Doctrine Does Not Apply to DNA Genotek's Quiet Title Claim.**

Ancestry offers no legal support for its claim that the economic loss doctrine bars DNA Genotek's quiet title claim.  As Ancestry acknowledges, the economic loss doctrine relates to tort claims.  (D.I. 11 at 3, 10); *Hermansen v. Tasulis*, 48 P.3d 235, 239 (Utah 2002) (the economic loss rule marks the boundary between contract law and tort law).  But Ancestry does not contend that DNA Genotek's quiet title claim is a tort action, nor does Ancestry present any authority stating that the economic loss doctrine can bar a non-tort quiet title claim.  (*See* D.I. 11 at 12-13.)

**3.      DNA Genotek Seeks a Remedy Protecting its Intellectual Property.**

DNA Genotek's ultimate concern in bringing this action is to protect its intellectual property and secure its ownership interest in any Ancestry improvements to DNA Genotek's devices.  Accordingly, if the Court holds it is more appropriate to maintain quiet title as a remedy for DNA Genotek's contract, conversion, and trespass to chattel claims, rather than as a standalone claim, DNA Genotek requests that the Court include in its ruling that DNA Genotek may pursue a quiet title remedy under these other claims.

**VI.      CONCLUSION**

For the aforementioned reasons, DNA Genotek respectfully requests that the Court deny Ancestry's motion to dismiss.  If the Court finds that DNA Genotek's pleading insufficiently states the claims at issue, DNA Genotek respectfully requests leave to amend the FAC.

OF COUNSEL:                                    */s/ Karen E. Keller*_____
David C. Doyle                                 John W. Shaw (No. 3362)
Brian M. Kramer                                Karen E. Keller (No. 4489)
MORRISON FOERSTER LLP                          300 Delaware Avenue, Suite 1120
12531 High Bluff Drive, Suite 100              SHAW KELLER LLP
San Diego, CA 92130                            Wilmington, DE 19801
(858) 314-5415                                 (302) 298-0700
                                               kkeller@shawkeller.com

Dated:  September 3, 2015                       *Attorneys for Plaintiff*